# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JOSEPH SIUDOCK,

                **Plaintiff,**

-vs-                                   **Case No.  6:12-cv-503-Orl-28KRS**

VOLUSIA COUNTY SCHOOL BOARD,

                **Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

        This cause came on for consideration without oral argument on the following motions filed

herein:

| | |
|---|---|
| **MOTION:** | **MOTION FOR PLAINTIFF'S SUMMARY JUDGEMENT AGAINST THE SCHOOL BOARD OF VOLUSIA COUNTY (Doc. No. 41)** |
| **FILED:** | **July 30, 2013** |

| | |
|---|---|
| **MOTION:** | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 45)** |
| **FILED:** | **July 31, 2013** |

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT (Doc. No. 63)** |
| **FILED:** | **August 13, 2013** |

<table>
<tr><td><strong>MOTION:</strong></td><td><strong>DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S RESPONSE TO DEFENDANT'S THIRD MOTION FOR SUMMARY JUDGMENT (Doc. No. 68)</strong></td></tr>
<tr><td><strong>FILED:</strong></td><td><strong>September 19, 2013</strong></td></tr>
</table>

## I. PROCEDURAL HISTORY.

On April 2, 2012, Plaintiff Joseph Siudock filed a complaint against the Volusia County School Board ("School Board"). Doc. No. 1. Siudock alleges that he worked as a teacher for the School Board from about 1985 through November 2010. *Id.* ¶ 6, 7. During the time of his employment, he alleges that he was an individual who was disabled or perceived as being disabled under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq. Id.* ¶ 11. Siudock alleges in Counts I and IV of the complaint that, after he filed charges with the Equal Employment Opportunity Commission ("EEOC"), the School Board discriminated and retaliated against him in violation of the ADA and the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. § 760.01, *et seq.* Siudock alleges in Counts II and V of the complaint that the School Board failed to make reasonable accommodations for his disability in violation of the ADA and FCRA. Siudock alleges in Counts III and VI of the complaint that the School Board constructively terminated him in violation of the ADA and the FCRA. Siudock alleges in Count VII of the complaint that the School Board breached a settlement agreement it entered into with him to resolve a previous charge of discrimination. Siudock seeks an injunction and compensatory damages, including damages for mental anguish and suffering, and an award of attorney's fees as to all counts except Count VII.[1]

---

[1] The prayer for punitive damages as to Counts I through VI was dismissed with prejudice. Doc. No. 20.

Both parties filed cross-motions for summary judgment. The parties have responded to those motions and filed motions to dismiss and strike set forth above. These motions have been referred to the undersigned for issuance of a Report and Recommendation. As set forth below, I respectfully recommend that summary judgment be granted in favor of the School Board and against Plaintiff Siudock.

## II.    SUMMARY JUDGMENT STANDARDS.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir.1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51(1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Anderson*, 477 U.S. at 249. "Essentially, the inquiry is `whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (*quoting Anderson*, 477 U.S. at 251-52); *see also Laroche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla.1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."). "[T]he summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Chapman v. AI Transp*., 229 F.3d 1012, 1026 (11th Cir.2000).

## III.     STATEMENT OF FACTS.[2]

Siudock was diagnosed in 1964 with insulin-dependent Type I Diabetes Mellitus and Brittle Labile Diabetes.  Doc. No. 54-1.

Siudock began work as a teacher in the School Board school system in 1985.  Doc. No. 1 ¶ 79.  The basic requirements of being a teacher are content knowledge and the ability to manage a classroom effectively regardless of which students are assigned to the teacher.  Beattie Dep., Doc. No. 58-1 at 159-61; Doc. No. 59-1 at 29; *see also* Doc. No. 60-5 at 63 (vocational expert testified in disability hearing that the transferable skills of a teacher include "instructing and training

---

[2] In his filing, Siudock asserted general denials of sworn testimony, relied on information about other individuals without supporting evidence, and addressed facts well outside the time period at issue in this case.  The School Board has objected to much of this information in its response to Siudock's motion for summary judgment.  While I have read all of the information in the record, I have included references to Siudock's unverified statements only to the extent that they are within the applicable time period and appear to be based on information that could be converted to admissible evidence at trial.  *See* Fed. R. Civ. P. 56.

people, . . . demonstrating, directing, examining, creating, lecturing, observing, planning, reviewing, supervising and testing").

The School Board was aware that Siudock was diabetic. Roberson-Mack Decl., Doc. No. 47 ¶ 3. The School Board has an ADA accommodation procedure under which an employee is requested to tell it what the disability is and what accommodation the person feels can allow him to perform the essential functions of his jobs. Roberson-Mack Dep., Doc. No. 54, at 10. Sherlie Roberson-Mack was responsible for making accommodations under the ADA. *Id.* at 7. After considering an employee's request for accommodation, Roberson-Mack would provide a letter indicating whether the accommodation was being provided or, if not, explaining the employee's appeal rights. *Id.* at 13.

In August 2005, Siudock accepted a position as a teacher for homebound/hospital education. *See* Siudock Dep. I at 23-32.[3] Hospital/Homebound is an instructional position to teach students who are not able to attend school for health reasons.[4] The teacher could provide instruction from his home. Gray Dep., Doc. No. 59, at 9-10. Siudock was a social studies teacher. In the homebound/hospital education position, he was required to teach ten subjects including algebra, science and language arts. Siudock Dep. I at 20-21. Many of the students had behavioral problems. *Id.* at 22.

---

[3] The transcript of the first day of Siudock's deposition is found at Doc. Nos. 50, 50-1 and 50-2. Throughout this Report, I will cite to internal pagination of depositions transcripts rather than the pagination assigned by CM/ECF.

[4] In his unverified motion for summary judgment and motion to dismiss, Siudock states that the students in this program were mostly expelled students, not medically needy students. Doc. No. 41 at 4; Doc. No. 63 at 4.

In 2005, Siudock filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC").  Doc. No. 1 ¶ 13; Doc. No. 14 ¶ 13.  The parties entered into a settlement agreement  in April 2006.  Doc. No. 1 ¶ 14; Doc. No. 14 ¶ 14; Doc. No. 50-4 (the "2006 Settlement Agreement").  The agreement provided, among other things, that the School Board would assign Siudock a teaching position in social studies at one of six identified schools during the 2007-2008 school year provided that Siudock received at least a "Meets Expectation" on his 2006-2007 performance evaluation.  Doc. No. 50-4 at 1.  The School Board also agreed that it would not discriminate or retaliate against any person because of opposition to any practice deemed illegal under the ADA.  *Id.*  The parties agreed to meet during the preplanning session before the 2007-2008 school year to agree on the reasonable accommodation to place Siudock's classroom near a facility that Siudock could use to check his glucose levels in private, as necessary.  *Id.* at 2.  The settlement agreement also provided a procedure for Siudock to request assistance from his principal and School District Attorney, Richard Kizma.  *Id*. at 1.[5]

Siudock applied for many positions.  Siudock Dep I at 40-41.  In December 2006, he was hired for the position of social studies teacher for gifted students after the previous teacher retired. In January 2007, he began that job at Creekside Middle School, where Deborah Drawdy was the principal.  Siudock Dep. I at 34, 37, 48; Pohlman Dep., Doc. No. 57 at 17.  He taught two periods of sixth grade geography, two periods of seventh grade geography and two periods of eighth grade American History, all to gifted students.  Doc. No. 50 at 53.  In this position, he was assigned less than twenty students per period.  *Id*.

---

[5]  The 2006 Settlement Agreement contains a mutual release of all disputes between the parties on and before May 3, 2005.  Doc. No. 50-3 at 2.

Siudock was assigned to classroom 3-017, which was a smaller classroom than others that had a storage area and a bathroom that could be entered from within the classroom with a door that could be locked. Siudock Dep. I at 37; Pohlman Dep., Doc. No. 57 at 7-8, 10; *see also* Tucker Decl., Doc. No. 46, ¶ 3 (setting forth dimensions of classroom 3-017). There was an adjacent administrative office with a window looking into the classroom. Siudock Dep. I at 36; Pohlman Dep. 9. Susan Jackson, an assistant principal who used the adjacent administrative office, put curtains up to cover the window looking into the classroom. Jackson Decl., Doc. No. 49 ¶ 5. Students with behavioral problems were often in the administrative office and their outbursts could be heard in Siudock's classroom. Siudock Dep. I at 56-58. Siudock complained about the noise disrupting his classroom. *Id.* at 58-59.[6]

Because a teacher was never allowed to leave students unsupervised, Siudock could use a call button or send a student to the administrative office to get a staff or faculty member to supervise his students when he needed to use the restroom. Tucker Decl. ¶ 8. Campus advisors who monitored the school campus also carried radios and could call for assistance. Pohlman Dep. at 38-40; *accord* Siudock Dep. II, Doc. No. 51, at 34-35. Siudock testified that the call button was not always answered[7] and campus advisors were difficult to reach. Siudock Dep. II at 40-41. Nevertheless, he was always able to administer insulin when he needed it, even if he did so in the back of the classroom. Siudock Dep. II at 66.

---

[6] Assistant Principal Jackson averred that no other teacher complained about noise from her office intruding into classroom 3-017. Jackson Decl. ¶ 7.

[7] In response to Siudock's complaint, Principal Beattie checked and found that the call button worked. She instructed the front desk person to respond to a call from Siudock immediately. Beattie Dep. at 78-79, 82.

In April 2007, Siudock received a performance evaluation that showed that he needed improvement in one area. Siudock Dep. I at 59. He was told that a student complained about him. *Id.* at 60. Siudock believed the evaluation was in retaliation for complaining about his classroom assignment. *Id.* at 62.

Kevin Tucker became the principal of Creekside Middle School at the beginning of the 2007-2008 school year. Tucker Dep., Doc. No. 56, at 6. Siudock was assigned all gifted classes. Siudock Dep. I at 64. Siudock considered this class schedule to be a great situation. *Id.* at 72.

Shortly after Principal Tucker began this job, Siudock asked that Tucker make him the sponsor of the National Junior Honors Society. *Id.* at 65. Tucker appointed Siudock to that position and other positions. *See, e.g., id.* at 66, 113-14, 127; Doc. No. 47-1 at 2.[8] These were discretionary appointments. Gray Dep. at 55-57.

Before the 2007-2008 school year began, Siudock also spoke with Principal Tucker and asked to be assigned to a classroom in the media center building that was next to a bathroom. Siudock Dep. I at 35, 39, 64-65.[9] Siudock was reassigned to classroom 7-004, which was a classroom adjacent to the media center that opened to the outside. Pohlman Dep. at 15-16; Siudock Dep. I at 39, 66-67 (Principal Tucker moved Siudock to the media center); *see also* Tucker Decl. ¶ 4 (setting forth dimensions of the classroom). There was no bathroom that could

---

[8] Teachers would receive extra money for work as club sponsors. Beattie Dep. at 111.

[9] Principal Tucker testified that this meeting occurred around preplanning time. Tucker Dep. at 7. While Siudock testified that his meeting was not the preplanning meeting referred to in the 2006 Settlement Agreement, he told Roberson-Mack that he met with the Area Superintendent and the School District Attorney Kizma at the time of his transfer to Creekside Middle School to discuss his need for a classroom with a bathroom. Doc. No. 47-1 at 3.

be entered directly from this classroom. *Id.* at 16. There was a faculty bathroom in the seventh grade building that Siudock could use. Pohlman Dep. at 16; Tucker Decl. ¶ 4. There was also a bathroom in the media center. Pohlman Dep. at 16; Tucker Decl. ¶ 4. In order to use the bathroom in the media center, Siudock could walk from his classroom through the studio area and into the media room, or he could walk outside his classroom and enter the media room through the front door. Pohlman Dep. at 17-18, 20; *see also* Jackson Decl., Doc. No. 49, ¶ 4 (measuring distance to each bathroom).

Siudock worked with the media specialist/assistant, who worked near the studio area, to reach an agreement to leave the doors between classroom 7-004 and the media center bathroom unlocked so that Siudock could cut through to use the bathroom. *See, e.g.,* Doc. No. 50-5 at 2; *see also* Tucker Decl. ¶ 7. Siudock did not make Principal Tucker aware of this arrangement. Siudock Dep. I at 73.

In January 2008, the media specialist/assistant position was eliminated. Tucker Decl. ¶ 5. Because no employee was working in the studio area, and there were concerns for the safety and security of equipment and tapes stored in that area, the doors between classroom 7-004 and the media center bathroom were locked. Siudock Dep. I at 73-74; Tucker Dep. at 21-22; Tucker Decl. ¶ 6. Principal Tucker told Siudock and a teacher in another classroom with back door access to the media room that the doors would be locked. Tucker Dep. at 22.[10]

Principal Tucker declined Siudock's request for a key to the studio area doors. Siudock Dep. I at 74; Tucker Dep. at 27, 30. Principal Tucker instructed Siudock to enter the media center

---

[10] Siudock believed that the doors were later opened for another teacher, but Principal Tucker testified that did not occur. Siudock Dep. I at 74-75; Tucker Dep. at 104.

bathroom using the front door. Tucker Dep. at 23. He also told Siudock that he was near the faculty restroom in the seventh grade building. Siudock Dep. at 79; Tucker Dep. at 27; Tucker Decl. ¶ 7. Principal Tucker offered to move Siudock to another classroom with a bathroom, but Siudock rejected that offer, stating that it was too disruptive to move his classroom in the middle of a school year. Tucker Decl. ¶ 7. Siudock checked his glucose levels in the classroom, decreased his fluids intake, and had a campus advisor watch his students when he needed to use a restroom. Siudock Dep. I at 80-83.

In March 2008, Siudock submitted a complaint of discrimination, harassment and retaliation based on age, disability, religion and political beliefs to the School Board's equity office. Doc. No. 50-5. Specifically, Siudock alleged that: (1) in February 2007, he was directed to remove his awards and posters from the wall because they constituted a fire hazard; (2) a notice was sent to parents informing them that Siudock was not certified to teach gifted classes; (3) he was falsely accused of showing the movie *Halloween*; (4) he was denied the opportunity to be the chair of the Social Studies Department and the National Junior Honor Society sponsor; (5) he was told to refrain from releasing his students early; (6) he was accused in February 2008 of promoting the Democratic Party and making anti-Christian comments in the classroom; (7) he was given an unfair evaluation in March 2008; and (8) the studio area was locked so that he could no longer cut through to the media center to use the bathroom of his choice. Doc. No. 47-1 at 1-2.

Roberson-Mack was responsible for investigating the complaint. Roberson-Mack Decl. ¶¶ 2, 5; *see also* Doc. No. 50-5 (Siudock's discrimination complaint). Roberson-Mack conducted and prepared a report of her investigation. The investigation revealed the following:

- With regard to the removal of the awards and posters, Siudock was given that directive based on the findings of a fire safety inspection, which revealed that the wall hangings exceeded the allowable amount. Doc. No. 47-1 at 13. All other teachers who had issues regarding non-compliance were given similar directives. *Id*.;

- With regard to the letters to parents, it was determined that when Siudock was assigned to Creekside, he was not yet certified to teach gifted students, and thus was not "highly qualified" under the No Child Left Behind Act (NCLBA). Under NCLBA, parents must be notified if their child's teacher is not considered "highly qualified." *Id*. During the 2006-2007 school year, in compliance with its legal obligations, Creekside sent notices to the parents of those students who were assigned to the following teachers: Carolina Cullo, Erica Rutzler, and Siudock. *Id*.

- With regard to Siudock's claim that he was denied the opportunity to be a club sponsor, the investigation revealed that Principal Drawdy selected Eric Ellis in the spring of 2007 for the Social Studies Department Chair due to his tenure at Creekside and his knowledge of the school's social studies curriculum and staff. *Id*.[11];

- With regard to the showing of the *Halloween* movie, the investigation revealed that students complained to their parents that Siudock showed the movie during class. *Id*. at 14-15.;

- The investigation also revealed that it was reported that Siudock called a student "anti-feminist" and "Bible hugger," and that he addressed religion and politics in conjunction with his curriculum. *Id*. at 15.

- The investigation revealed that other teachers were given the directive not to release their students early. *Id*.;

- With regard to the doors to the production studio being locked, the investigation revealed that Siudock's classroom was in close proximity to two bathrooms. *Id.* at 12.

In conclusion, Roberson-Mack found that Siudock's complaints were not substantiated. *Id.* at 16.

---

[11] As noted above, Principal Tucker appointed Siudock to be a club sponsor.

Roberson-Mack also personally inspected the location of Siudock's classroom and the bathrooms available to him. She concluded that it was not feasible to give him a key to the studio area where equipment was being stored and determined that access to bathrooms provided to him was reasonable under the circumstances. Roberson-Mack Dep. at 22-24. She communicated her decision to Siudock. *Id.* at 25; Doc. No. 54-5.

For the 2008-2009 school year, Siudock taught one period of gifted civics, two periods of gifted sixth grade geography, and three periods of regular geography. Siudock Dep. I at 91-92. He considered this a very good schedule. *Id.* at 93.

Because of the continuing issues about a key to the studio area, Principal Tucker reassigned Siudock to classroom 3-017. Tucker Decl. ¶ 8. Siudock complained that Assistant Principal Jackson in the adjacent administrative office could hear Siudock when he used the toilet.[12] Tucker investigated by pouring a bucket of water into the toilet of the bathroom while another person stood in Jackson's office. The person in Jackson's office could not hear the water being poured into the toilet. Tucker Dep. at 42.

In October 2008, Siudock reported that his medical equipment was missing from his classroom. Principal Tucker admonished Siudock for leaving his medical equipment in the classroom, noting that this was the second such incident, and wrote: "Your lack of responsibility in securing your medical equipment is of great concern and borders on the line of a professional

---

[12] Siudock did not initially assert a frequent need to urinate as a basis for accommodation of his diabetes, and he could have used other bathrooms for this purpose. Siudock Dep. I at 51-53.

standards issue." Doc. No. 50-12 at 3. Siudock requested a lockable area in which he could keep his medical supplies, among other things. *Id*. at 2.

In the fall of 2008, Siudock was directed to prepared education plans ("EPs") for gifted eighth graders. These reports took hours to prepare. Siudock testified that he did not know why he was given this assignment. Siudock Dep. I at 76-77, 164.

On April 16, 2009, Siudock received a performance evaluation that reflected that he was performing satisfactorily or better in all areas. Doc. No. 50-16.

In the 2009-2010 school year, Siudock was assigned two periods of gifted/advanced American History, one period of regular American History, one period of gifted civics, one period of gifted geography, and one period of regular geography. Siudock Dep. I at 134-35. In October 2009, Siudock expressed concern about the number of classes he had to prepare for and the number of students with academic or behavioral problems assigned to his classes.[13] Doc. No. 50-17. Later in October, Siudock again wrote to Principal Tucker complaining that the large numbers of low performing students in his classes interfered with his ability to check his glucose levels and that noise from the adjacent administrative office disrupted his classes. Doc. No. 50-20; *see also* Doc. No. 50-21 at 2; Doc. No. 59-3 at 1 (February 9, 2010 email to Assistant Principal Jackson complaining about noise); Siudock Dep. II at 14-16.

In response to Siudock's complaints regarding the number of class preparations required, Principal Tucker learned that the content and curriculum for Siudock's classes were the same but different strategies and assignments would be used to challenge the higher level students. Doc.

---

[13] Principal Tucker did not receive any disciplinary referrals regarding student misconduct from Siudock. Tucker Dep. at 97.

No. 50-19; Doc. No. 50-21 at 1. He did not test the ability to hear students in Jackson's office

from Siudock's classroom because these issues were isolated and not daily occurrences. Tucker

Dep. at 43, 46. Principal Tucker also consistently encouraged Siudock to make taking care of his

health his first priority. Doc. No. 50-20; Doc. No. 50-21 at 1. As for the classes Siudock was

teaching, Principal Tucker indicated that there were not enough students to create a single gifted

class for the sixth period. Tucker Dep. at 48.

A teacher could request a change of class assignments for the next school year but changes

in classes were generally not done in the middle of a school year unless it was necessary to make

adjustments for a teacher who left. Tucker Dep. at 111-14; Pohlman Dep. at 30-31; Beattie Dep.

at 90-91. Class assignments were discretionary. Pohlman Dep. at 30; *see also* Gray Dep. at 18

(collective bargaining agreement did not guarantee the right to teach particular students), 44

(administrators make the schedules, not teachers).

At Siudock's request, Principal Tucker changed his supervising administrator from Jackson

and assigned himself to be Siudock's supervisor. Tucker Dep. at 55-56. In that role, Tucker

observed Siudock's classes. *Id.* at 56. Tucker observed need for improvement in Siudock's

teaching. *See, e.g., id.* at 59-60. Tucker was also aware that parents of students complained that

Siudock talked too much about his medical condition. *Id.* at 61; *see also* Tucker Dep. at 72-73;

Gray Dep. at 19-21; *see also* Doc. Nos. 50-7, 50-11, 50-15, 50-25, 50-30.

On November 9, 2009, Siudock received an evaluation report in which Principal Tucker

rated him as needing improvement in the ability to establish and maintain positive relationships

with students, families and colleagues, and in ethics/judgment. Doc. No. 50-22. Principal Tucker

wrote that Siudock should not refer to students as slackers, should not criticize fellow teachers and

that he should respond professionally to questions and concerns "without listing your medical conditions and your aches and pains." Doc. No. 50-22 at 2.

On January 18, 2010, Siudock filed a charge of discrimination with the EEOC. He alleged discrimination based on retaliation and disability occurring from November 2, 2008 through November 5, 2009 (He also alleged that he had been retaliated against for filing a workers compensation claim.). The specific instances alleged in his charge are: (1) being limited in the amount of student work that could be displayed; (2) the number of students assigned to his class created a fire and safety hazard; (3) being given a rigorous and less desirable teaching schedule; (4) receiving a negative performance evaluation; (5) Principal Tucker and Assistant Principal Jackson fabricating statements from parents and students who performed poorly in his classes and publicly degrading him in writing; (6) threatening to refer him to Professional Standards for keeping his medical equipment in a locked bathroom; and (7) Principal Tucker yelling at him in front of his students on November 5, 2009 and stating that he could have Siudock fired because of his disability. Doc. No. 50-23.

On January 5, 2010, Suzanne Rawlins, the Gifted Program Administrator, recommended, after observing Siudock in class, that he be given additional instruction in teaching gifted students by attending a demonstration class. Doc. No. 50-24. She included with her recommendation suggestions for classroom instruction by Siudock. Doc. No. 50-24 at 2-3.

On March 24, 2010, Principal Tucker again rated Siudock as needing improvement in the areas of establishing and maintaining positive relationships and ethics/judgment. He placed Siudock on a Stage I Success Plan in an effort to help him improve in certain areas. Tucker Dep. at 62-63; Doc. No. 50-26; *see also* Gray Dep. at 24-28. On April 28, 2010, Principal Tucker

indicated that improvement in these areas was still needed. Doc. No. 50-27. On May 17, 2010, the Stage I Success Plan completion date was extended to September 3, 2010. Doc. No. 50-28.

In response to Siudock's requests for a meeting, School District Attorney Kizma instructed Siudock to discuss requests for accommodations with Principal Tucker and Roberson-Mack, and to address complaints of retaliation to the Director of Professional Standards, Jim Hollins. Doc. No. 50-29.

Hollins met with Siudock on May 10, 2010. Siudock requested that his classroom be relocated because of the disruption from noise in the adjacent administrative office that was causing an increase in his glucose levels. Doc. No. 50-30 at 1. He also complained of harassment by Principal Tucker and others. *Id.* Principal Tucker denied the allegations, specifically including the allegations that he yelled at Siudock in front of students, threatened to have him fired and called him crazy. *Id.* at 2; Tucker Dep. at 92-93.

Siudock also complained that so many students were assigned to his class that a fire hazard was created. Upon investigation, Hollins learned that Siudock's classroom was not a fire hazard, but that there were concerns about location of furniture in his classroom. Doc. No. 50-30 at 3.[14] Siudock complained that he bumped into a desk and broke his foot. Principal Tucker walked the room and found plenty of room to move about and for access. Tucker Dep. at 100-01.

Siudock requested to teach gifted geography, advanced geography, gifted civics and gifted/advanced American history in the 2010-2011 school year. Doc. No. 56-4. On June 8, 2010, Principal Tucker sent a letter to Siudock regarding his teaching assignment for the 2010-2011

---

[14] The fire marshal had directed that papers be removed from the walls of Siudock's classroom because they exceeded the approved percentage. Tucker Dep. at 102.

school year. Principal Tucker indicated that Siudock was tentatively scheduled to teach sixth grade geography and that he was tentatively assigned to classroom 4-015, which also had a self-contained bathroom. Tucker Decl. ¶ 11; Doc. No. 51-3.

Karen Beattie became the Principal of Creekside Middle School in July 2010. Beattie Decl., Doc. No. 48, ¶ 2. Due to funding and staffing developments, Principal Beattie testified that many of the tentative teaching assignments had to be changed. Principal Beattie also wished to give Siudock fewer class preparations to ease his workload and give him the best chance to succeed. *Id.* ¶ 3.[15] She informed Siudock that he would be assigned to eighth grade general education social studies, which would require only one preparation, and he would remain in classroom 3-017. Beattie Decl. ¶ 4; Beattie Dep. at 18-19, 30, 142; *see also* Doc. No. 58-3; Doc. No. 59-1 at 34-35 (description of class preparation). The adjacent administrative office was vacant. Beattie Dep. at 64-65, 100.[16] Principal Beattie also made the third period Siudock's planning period to accommodate his need to check his glucose levels. He had lunch after the fifth period. Beattie Dep. at 24-25, 142; Siudock Dep. II at 28-29.

Siudock objected to the assignment because he wanted to teach only gifted and honors classes. Beattie Dep. at 17, 20. He did not raise the issue of stress as part of his request. Beattie Dep. at 29; *see also* Beattie Dep. at 138-39 (Siudock indicated that he could check his glucose levels in front of gifted and advanced students but not in front of regular students due to behavior

---

[15] In his unverified motion to dismiss, Siudock wrote, "The staffing adjustments were to drop Gifted, Self-Contained, Civics and American History." Doc. No. 63 at 8.

[16] In his unverified motion to dismiss, Siudock wrote that the administrative office was used as a general meeting room. Doc. No. 63 at 9.

problems).[17]  Beattie knew that Siudock was on a success plan and that numerous parents and

students had requested not to have him teach gifted students.  Beattie Dep. at 20-2.[18]  Beattie spoke

with him about his concerns.  Beattie Dep. at 14-15, 17.  She also asked Assistant Principal

Pohlman to visit the classroom and remove extra desks to make more room, and she suggested

that Siudock move some bookcases and projects.  Siudock declined to do so.  Beattie Dep. at 67-

69; Doc. No. 58-6.

Beattie did not assign Siudock any club sponsorships based on problems with his work

with the National Honors Society and Students Working Against Tobacco and requests that

Siudock be replaced.  Beattie Dep. at 102-07.

Principal Beattie asked Siudock not to bring bread and pastries to the school because,

among other things, they had to submit a health plan focused on being a healthy campus.  Beattie

Dep. at 108-09.

On August 13, 2010, Donald White, M.D., one of Siudock's treating physicians, wrote a

letter in which he indicated that Siudock needed to be allowed to check his glucose levels at work

on a scheduled basis before meals and otherwise as necessary.  He also noted that an increased

stressful environment and instructing students that were difficult to manage could adversely affect

glucose control.  Doc. No. 53-3.

_____

[17]  Principal Beattie also told Siudock not to check his glucose levels or administer medication in the presence of students during instructional time.  Doc. No. 58-7.  She made this statement at the suggestion of Roberson-Mack due to safety concerns.  Beattie Dep. at 148-52. Principal Beattie had no concerns about Siudock eating or drinking beverages in front of his students.  *Id.* at 156.

[18]  Siudock indicated that gifted and advanced students complained in order to get a class schedule change.  Siudock Dep. I at 110-11; Siudock Dep. II at 24-25.

On August 19, 2010, Siudock asked Roberson-Mack to reassign him to gifted and advanced students, return him to all club and leadership positions, and provide accommodations to check his glucose. Roberson-Mack responded on September 16, 2010, that Siudock was being accommodated by being provided a lockable bathroom in his classroom and a lockable cabinet for his medical supplies.[19] She indicated that assignments to clubs and leadership positions were discretionary and not required job functions of a classroom teacher. Finally, she indicated that because he was performing his essential job duties (albeit with a need for improvement in some areas), a return to teaching gifted and advanced classes was not necessary for him to perform his job duties. Doc. No. 54-6.

At some point, Siudock appealed the decision not to move him to a larger classroom and assign him gifted classes. Roberson-Mack Dep. at 28-29.[20] The appeals committee determined that providing him a classroom with a self-contained bathroom outweighed his request for a larger classroom without a bathroom. *Id.* at 29. An offer was made to rearrange furniture and remove items from the smaller classroom, which Siudock did not accept. *Id.* at 29-30. The appeals committee determined that the request to assign Siudock to gifted students did not relate to an ADA issue. *Id.* at 32.

On August 30, 2010, Christine Rho, M.D., began treating Siudock for uncontrolled Type I insulin-dependent Labile and Brittle Diabetes. Rho Dep., Doc. No. 52, at 11, 33. Siudock had

---

[19] Siudock testified that he did not have a lockable bathroom cabinet. Siudock Dep. II at 33. He later clarified that he had a lockable cabinet but that he was not provided a lock. *Id.* at 43.

[20] The collective bargaining agreement did not address classroom assignment. Gray Dep. at 95.

previously been diagnosed with diabetic retinopathy. *Id.* at 41. Dr. Rho also diagnosed diabetic neuropathy which caused reduced sensation in Siudock's legs and feet. *Id.* at 28, 70.

Siudock was required to check his glucose levels at least four times a day, once at each meal and at bedtime. *Id.* at 13. Dr. Rho's records reflect that Siudock was checking his glucose levels six to eight times a day. *Id.* at 18. Checking glucose requires a patient to clean the finger with an alcohol pad, prick the finger with a lancet to draw blood, put the blood on a testing strip and insert the strip into the meter (some brands of glucose meters have a slightly different set up). *Id.* at 16. The patient would draw the necessary amount of insulin from the bottle into a syringe and inject it. *Id.* at 17-18. The entire process would take twelve to fifteen minutes. *Id.* at 19.

Siudock told Dr. Rho that he was stressed at work because he was teaching dropout prevention students who were more difficult to manage. *Id.* at 36; *see also* Doc. No. 52-2 at 39. Dr. Rho observed that stress and anxiety can raise glucose levels. Rho Dep. at 20, 73. Dr. Rho wrote a letter similar to that written by Dr. White regarding the need for Siudock to test his glucose levels and the effect stressful situations could have on the ability to control glucose levels. Doc. No. 52-3 at 62. Dr. Rho recommended that Siudock be allowed to monitor his glucose six to eight times a day, although she testified that all of this monitoring need not be done during the workday. Doc. No. 52 at 32. At Siudock's request, she also recommended that Siudock be assigned to students in honors or gifted programs because Siudock told her he could not trust other students to stay away from his medical equipment. *Id.* at 34-35; *see also* Siudock Dep. I at 69.

Principal Beattie saw the physicians' letters. Beattie Dep. at 74-75. Principal Beattie told Roberson-Mack that she did not think the request to teach gifted and honors students was valid because it was based on information provided by Siudock and not supported by information

regarding the students he was teaching or his class assignments. Beattie Dep. at 92-93. Further, she indicated that stress from disruptive students resulted from an ineffective operation of the classroom by the teacher. *Id.* at 158.[21] Finally, she observed that there was no open class into which to transfer Siudock, and the students already assigned to other teachers were being successful so there was no cause to disrupt the students with a teacher change. Beattie Dep. at 94, 154-56.

Roberson-Mack considered the requests in the physicians' letters. Roberson-Mack Dep. at 34-35. The request for a place for Siudock to check his glucose levels was accommodated by the bathroom in his classroom. *Id.* at 36. The request to change the type of students assigned to Siudock was not was not within Roberson-Mack's authority. *Id.* Further, Roberson-Mack could not guarantee that students in a gifted class would not be stressful. *Id.* at 43; *accord* Pohlman Dep. at 25 (disruptive students could be found in any classroom on a school campus), 28 (gifted students also have discipline issues); Siudock Dep. II at 9 (acknowledging that some gifted students have behavioral problems).

Principal Beattie observed Siudock's teaching a minimum of once a week. She described his teaching as "painful to watch . . . ." Beattie Dep. at 39, 40, 43. The students were polite and compliant but not engaged. He did not seem to have a scope and sequence that he was trying to accomplish in the class. *Id.* at 43. Because Siudock had complained about his students being

---

[21] If a teacher was having disciplinary issues with his students, someone from the administration might come to the class to assist by speaking to the class in general. Pohlman Dep. at 32. A teacher could also be asked to attend classroom management training and, in a severe case, the teacher could ask to have a student removed from his class. Pohlman Dep. at 33. If a teacher could not teach due to stress, he could take a leave of absence. Grant Dep., Doc. No. 55, at 27.

challenging, Principal Beattie looked at data and determined that Siudock was not assigned an abnormal amount of students that she would be concerned about. Beattie Dep. at 35, 58-59. She also noted that Siudock's students had an inordinate amount of lower grades (Ds and Fs). Beattie Dep. at 60.

On September 13, 2010, Principal Beattie met with Siudock to discuss his progress under the Stage I success plan. Based on her observations of Siudock's performance, Principal Beattie informed Siudock that he was still not showing signs of improvement. Accordingly, she moved him to a Stage II success plan. Beattie Decl. ¶ 6; *see also* Doc. No. 48-1 (Volusia County Teacher Assessment System Handbook).[22]

On September 23, 2010, Dr. Rho wrote another letter at Siudock's request requesting accommodations to permit Siudock to test his glucose levels and assignment to less stressful students. Rho Dep. at 42; Doc. No. 52-4 at 1. During her deposition, Dr. Rho testified that even if Siudock gave her inaccurate information, she would have recommended that he be given an area where he could check glucose levels multiple times a day and that he be permitted to consume food as needed. She would not have made a recommendation about work stress except for Siudock's indication that he was working with stressful students. Rho Dep. at 42-43; *see also id.* at 76 (Dr. Rho believed the request for a less stressful work environment was appropriate based on Siudock's consistently high glucose readings). *Cf.* White Dep. at 55-56 (noting that Siudock experienced stress due to his wife's medical condition).

---

[22] Robert Gray, a union representative who attended meetings between Principal Beattie and Siudock, found Beattie to be professional and matter-of-fact. Gray Dep. at 78, 107-08. In contrast, Siudock described Principal Beattie's demeanor in meetings with he and Gray as "flames coming out of her." Siudock Dep. II at 72.

On October 19, 2010, Principal Beattie met with Siudock to discuss his progress under the Stage II success plan.  She informed Siudock that he had failed to show sufficient improvement based on her observations of his performance.  Principal Beattie did not complete a Stage III success plan for Siudock because he voluntarily retired shortly after this meeting.  Beattie Decl. ¶ 7.

On November 2, 2010, again at Siudock's request, Dr. Rho and Dr. White each completed forms in which they opined that Siudock was permanently disabled from gainful employment.  Rho Dep. at 48-49; White Dep. at 50-51; Doc. No. 52-2 at 44; Doc. No. 53-4 at 2.  In a deposition taken in May 2013, Dr. Rho testified that Siudock remained unable to work in any capacity, including as a teacher.  Rho Dep. at 54, 58-59.  Dr. Rho opined that Siudock would never recover from diabetes, retinopathy and neuropathy.  *Id.* at 59.  The Florida Retirement System approved Siudock for disability retirement based on certifications from these two physicians that Siudock was unable to work.  Gray. Dep. at 51-52.

On November 7, 2010, Siudock filed another charge of discrimination with the EEOC.  Doc. No. 51-12.  He alleged that since he filed his earlier charge of discrimination, he was retaliated against by being removed from leadership positions thereby losing opportunities for additional compensation.  He further alleged that the School Board did not accommodate his disability in response to letters from his physicians indicating that he should be in a less stressful classroom environment.  Siudock also alleged that he was placed on a performance improvement plan.  Doc. No. 51-12. [23]

---

[23] Siudock further alleged that he was told that he would be terminated if he did not take a disability retirement.  Doc. No. 51-12.  However, in his unverified motion to dismiss, Siudock

On March 26, 2012, the Social Security Administration granted Siudock's application for disability benefits and found that Siudock was disabled as of November 2, 2010.  Doc. No. 60-1.[24]

## IV.    ANALYSIS.

Both Siudock and the School Board seek entry of summary judgment in their favor on all counts.  I will address the cross-motions for summary judgment as to each type of cause of action below.

### A.    *Disability Discrimination and Failure to Accommodate.*

The ADA prohibits covered employers from discriminating against a qualified individual with a disability in regard to terms, conditions and privileges of employment.  42 U.S.C. § 12112(a).  The FCRA prevents employment discrimination based on an individual's handicap. Fla. Stat. § 760.01(2).  Because Florida courts construe the FCRA in conformity with the ADA, a disability discrimination cause of action is analyzed under the ADA.  *See McCaw Cellular Commc'ns of Fla., Inc. v. Kwiatek,* 763 So. 2d 1063, 1065 (Fla. 4th Dist. Ct. App. 1999).

To state a *prima facie* case of disability discrimination, Siudock must show the following: (1) that he has a disability; (2) that he is a qualified individual with or without a reasonable accommodation; and (3) that he was discriminated against because of his disability.  *Rossbach v. City of Miami*, 371 F.3d 1354, 1356-57 (11th Cir. 2004).  For purposes of summary judgment, there is no dispute that Siudock's diabetes is a disability.

_____

wrote that he voluntarily retired on November 30, 2010.  Doc. No. 63 at 12.  He also testified that no administrator told him to seek a medical retirement.  Siudock Dep. II at 78-79.

[24]  During the hearing before an Administrative Law Judge held on February 22, 2012, Siudock testified that he did not believe he could teach anybody at that point.  Doc. No. 60-5 at 60.

The School Board argues that Siudock has not established the second factor of the *prima facie* case.

> The term "qualified," with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, without or without reasonable accommodation, can perform the essential functions of such position.

29 C.F.R. § 1630.2 (m). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." *Id.* § 1630.2(n). In determining what functions of a job are essential consideration must be given to the employer's judgment. 42 U.S.C. § 12111(8).

The School Board presented evidence that the essential functions of the job of teacher include the ability both to teach and to manage a classroom effectively. *See, e.g.,* Beattie Dep. at 159-61; Doc. No. 59-1 at 29; Doc. No. 60-5 at 63 (vocational expert testified before the Social Security Administrative that job of teacher requires the specific skills of instructing and supervising, among others). It contends that Siudock has not established that he could perform these essential functions because he was not able to teach and to manage a classroom of general education students effectively because the stress of this work exacerbated his diabetes. It cites to the opinions of Dr. Rho, Dr. White and Siudock's own testimony in support of this position.

Siudock submits that he could work as a teacher if the School Board accommodated him by assigning him to less stressful classes composed of only gifted and advanced students. However, the undisputed evidence establishes that gifted and advanced students also have

disciplinary problems. Roberson-Mack Dep. at 43 (no guarantee that gifted and advanced students would not be stressful); Pohlman Dep. at 25 (disruptive students could be found in any classroom on a school campus), 28 (gifted students also have discipline issues). Indeed, Siudock admitted during his depositions that some gifted students have behavioral problems, including complaining about a teacher to receive a new class assignment. Siudock Dep. I at 110-11; Siudock Dep. II at 9, 24-25. Therefore, Siudock has not established that he was a "qualified" person with a disability because he could not perform the essential job functions of teaching and effectively managing a classroom due to stress which exacerbated his diabetes.

Even if assignment to only gifted and advanced students had been shown to be less stressful, the School Board had no obligation to create a position or remove another teacher from a position to accommodate Siudock's disability. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001) (The ADA "does not require an employer to bump another employee from a position in order to accommodate a disabled employee."); *Mattingly v. Univ. of S. Fla. Bd. of Trustees*, 931 F. Supp. 2d 1176, 1185 (M.D. Fla. 2013) ("'[R]eassignment to another position is a required accommodation only if there is a vacant position available for the which the employee is otherwise qualified.'") (quoting *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997)). There is no evidence that a position to teach only gifted and advanced students was vacant in the 2009-2010 or 2010-2011 school years.[25] Rather, the evidence shows that in the 2009-2010 school year there were not enough students to create a gifted geography class. Tucker Dep. at 48. In the 2010-2011 school year, the evidence shows that there was no vacant position for a teacher of

---

[25] During the earlier school years at issue, Siudock had been assigned only gifted/advanced students, as discussed above.

gifted/advanced students and that gifted/advanced students were doing well with their assigned teachers. Beattie Dep. at 94, 154-56. Therefore, Siudock has not carried his burden of showing that the School Board failed to give him a reasonable accommodation to alleviate stress which exacerbated his diabetes.

Finally, Siudock argues that the School Board failed reasonably to accommodate his need for a private area to check his glucose levels and administer insulin. The undisputed evidence shows, however, that the School Board went to great lengths to provide Siudock with a classroom with a self-contained bathroom. It moved Siudock to a classroom adjacent to the media room that did not have a self-contained bathroom at Siudock's request. This classroom had two bathrooms reasonably accessible for Siudock's use. Siudock also admitted that he never failed to take required insulin due to problems getting someone to supervise his students. He has, therefore, failed to carry his burden of showing that the School Board failed to provide a reasonable accommodation in this respect.

In sum, Siudock has not carried his burden of showing that he was a qualified individual with a disability because he has not shown that he could perform the essential function of teaching and supervising students with or without reasonable accommodations. He also did not carry his burden of showing that the School Board did not take reasonable steps to accommodate his need to check his glucose levels. Accordingly, summary judgment on his claims of disability discrimination and failure to make reasonable accommodations is due to be granted in favor of the School Board.

*B.      Retaliation.*

To establish a *prima facie* case of retaliation in violation of the ADA and FCRA, Siudock must establish that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and, (3) a causal link between the protected expression and the adverse action. If he establishes this *prima facie* showing, then the burden shifts to the School Board to articulate a non-retaliatory reason for the adverse employment action. If the School Board makes this showing, then the burden returns to Siudock to show that the School Board's stated non-retaliatory reason was pretextual. *Mattingly*, 931 F. Supp. 2d at 1186-87.

There is no dispute that Siudock engaged in statutorily protected expression by filing charges of discrimination and asking for accommodations for his disability. Siudock alleges that the School Board did the following in retaliation for that expression: (1) assigning him a more rigorous teaching schedule; (2) removing him from leadership positions; (3) failing to accommodate his need for breaks to check his glucose levels, administer insulin and eat; (4) placing him in a more stressful classroom environment; and, (5) harassment. *See, e.g.,* Doc. No. 1 ¶ 99. The School Board does not assert that these actions were not adverse employment actions as defined by controlling case law or that Siudock failed to show the requisite causal link. Therefore, for purposes of summary judgment only, Siudock has established a *prima facie* case of retaliation.

The School Board presented evidence of legitimate, non-discriminatory reasons for its actions. As for class schedule in 2009-2010, which Siudock describes as more rigorous, Siudock was assigned three different subjects to teach. The evidence shows that Siudock did not consider teaching three different subjects to be difficult in school year 2008-2009. *See* Siudock Dep. I at 91-93. Siudock asserts, however, that the 2009-2010 schedule was more difficult than 2008-2009

schedule because two of his classes were taught to general education students rather than gifted/advanced students. Principal Tucker investigated this complaint and learned that the difference was simply a change in strategies and assignments depending on the level of the student, not different content and curriculum. Doc. No. 50-19; Doc No. 50-21 at 1. Finally, the School Board presented evidence that there were not enough students to make another gifted class for Siudock to teach in 2009-1010. Tucker Dep. at 48. These are legitimate non-discriminatory reasons to support the 2009-2010 class assignment. Siudock offered no evidence, other than his unsupported belief, that he was given the 2009-2010 class schedule in retaliation for his protected expression.

As for the complaint of removing him from leadership positions, the School Board offered evidence that Siudock was not reappointed to club sponsorships and other leadership positions because individuals involved with the clubs and other programs requested that Siudock not be reappointed. Beattie Dep. at 102-07. This is a legitimate, non-discriminatory reason for that action. Siudock has not submitted any evidence, other than his own unsupported belief, that this explanation is pretextual.

As for failing to accommodate his need to check his glucose levels, administer insulin and eat, the evidence establishes that the School Board did make these accommodations, as discussed above. Similarly, also as discussed above, the evidence does not establish that the School Board placed him in a more stressful teaching environment. Indeed, Principal Beattie testified that she modified Siudock's teaching schedule for 2010-2011 to ensure that he had fewer different classes to prepare. Beattie Decl. ¶ 3.

Finally, as to Siudock's general complaint of harassment, the School Board has presented legitimate non-discriminatory reasons for its actions, to the extent Siudock has adequately articulated them. It assigned Siudock to classroom 3-017 to accommodate his request for a bathroom. It transferred him to classroom 4-007 at his request. Principal Beattie asked him not to bring pastries to the school based on the school's healthy eating program. Beattie Dep. at 108-09. Once again, other than his unsupported belief that these actions were retaliatory, Siudock has presented no evidence that the reasons stated by the School Board are pretextual.

Accordingly, summary judgment on Siudock's claims of retaliation is due to be granted in favor of the School Board.

C.    *Constructive Termination.*

To establish constructive termination, Siudock "must prove that his working conditions were 'so intolerable that a reasonable person in [his] position would have been compelled to resign.'" *Stedman v. Bizmart, Inc.*, 219 F. Supp. 2d 1212, 1224 (N.D. Ala. 2012) (quoting *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1283 (11th Cir. 1999)). This showing cannot be based on a plaintiff's subjective feelings about his employer. Rather, "[a] plaintiff 'must show more than that the working conditions were not to [his] liking; [he] must prove that the alleged intolerability of working conditions resulted from acts of discrimination.'" *Id.* at 1224-25 (quoting *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1367 (S.D. Fla. 1999)).

As discussed above, Siudock has not sustained his burden of showing that he was subjected to intolerable working conditions resulting from acts of discrimination. Additionally, the School Board presented evidence that, as of November 2, 2010, Siudock's physicians opined that he could no longer work at any occupation. Indeed, Dr. Rho testified in May 2013 that

Siudock's disabling medical condition did not substantially improve after he left his job as a teacher, Rho Dep. at 54, 58-59, which is further evidence that his resignation was the result of his worsening medical condition, not intolerable working conditions.

Accordingly, summary judgment on the constructive termination claim is due to be granted in favor of the School Board.

      *D.*      *Breach of the 2006 Settlement Agreement.*

Siudock alleges that the School Board breached certain provisions of the 2006 Settlement Agreement. Although the 2006 Settlement Agreement does not state the applicable law, the agreement was signed by parties in Florida. Therefore, Florida law applies. Under Florida law, the elements of breach of contract are (1) a valid contract; (2) material breach; and (3) damages. *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. 4th Dist. Ct. App. 2003).

There is no dispute that the 2006 Settlement Agreement is valid.

Siudock alleges that the School Board breached paragraph 4 of the 2006 Settlement Agreement by discriminating and retaliating against him. Doc. No. 54-4 ¶ 4. For the reasons discussed above, Siudock has not shown that the School Board discriminated or retaliated against him. Therefore, the evidence does not show breach of paragraph 4 of the 2006 Settlement Agreement.

Siudock further alleges that the School Board breached paragraph 7D of the 2006 Settlement Agreement by failing to meet with him during the preplanning session before the 2007-2008 school year to agree on the reasonable accommodation to place his classroom near a facility that would accommodate the need for privacy to check his glucose levels as necessary. *Id.* ¶ 7D. The evidence shows, however, that Siudock did meet with the School District Attorney and Area

Superintendent to discuss this accommodation and that Siudock talked with Principal Tucker around the preplanning time before the 2007-2008 school year about this accommodation. Further, the evidence shows that the School Board actually accommodated Siudock by assigning him to a classroom with a self-contained bathroom for the 2007-2008 school year. Accordingly, the evidence does not establish that the School Board materially breached this provision of the 2006 Settlement Agreement or that Siudock was damaged by the failure to hold the required meeting "during the preplanning session before the 2007-2008 school year."

Finally, Siudock argues that the School Board breached paragraph 7F of the 2006 Settlement Agreement which provides as follows:

> [The School Board] and [Siudock] agree that if [Siudock] needs assistance he will communicate his request via e-mail to his principal for appropriate action. If the principal fails to respond within three (3) business days, [Siudock] will e-mail the principal a second request as a follow up to the initial request for assistance and copy via e-mail to the principal's supervisor and Richard Kizma, Chief Counsel, for appropriate action.

*Id.* ¶ 7F. This provision of the 2006 Settlement Agreement requires Siudock to present his complaints in the described fashion. It does not obligate the School Board to take particular action. Furthermore, the evidence shows that the School Board responded to Siudock's various complaints. For these reasons, Siudock has not established that the School Board breached this provision of the 2006 Settlement Agreement.

Accordingly, summary judgment on the claim of breach of the 2006 Settlement Agreement is due to be granted in favor of the School Board.

## V.     RECOMMENDATION.

Based on the foregoing report, I respectfully recommend that the Court do the following:

1.     **GRANT** Defendant's Motion for Summary Judgment, Doc. No. 45;

2.     **DENY** the Motion for Plaintiff's Summary Judgment Against the School Board of Volusia County, Doc. No. 41;

3.     **DENY** Plaintiff's Motion to Dismiss Defendant's Motion for Summary Judgement, Doc. No. 63;

4.     **DENY** as moot Defendant's Motion to Strike Plaintiff's Response to Defendant's Third Motion for Summary Judgment, Doc. No. 68; and,

5.     **DIRECT** the Clerk of Court to enter a judgment in favor of Defendant Volusia County School Board and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on October 30, 2013.

_Karla R. Spaulding_
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy